This is a case where there was a dangerous condition that was present on a seesaw that the plaintiff, a 7-year-old girl, Taylor Tagliere, was playing on. Now, the trial court mistakenly concluded that you had to have only actual knowledge, constructive knowledge would not be enough to prevail on a willful and wanton claim. Because of that, it never really, it found that at best in its mind it was constructive knowledge and it never did any kind of a risk versus burden analysis regarding the willful wanton issue that the court highlighted as of special interest here on these arguments. Now, I am going to go to the willful and wanton standard right away then since that's where you've indicated the interest is. And first I want to say that it's clear in Illinois law that you can have actual or constructive notice for a willful and wanton claim against a municipality. We see that with Sullivan, we see that with Molman, we see that with McDermott. And also a case that's not against a municipality but that did involve a willful and wanton standard is Olitz which was recently decided by the first district where they used the same definition for willful and wanton that is used in the Tort Immunity Act. The exact same definition. Now, willful and wanton obviously implies a different degree of program, I think the word is it's been used in the past, to distinguish just mere negligence from conduct that is reckless disregard or indifference for the safety of the intended users of the recreational property. In this case, there's no claim that there was an intentional destruction of the property so that it became dangerous. Now, I do want to focus on cases like McDermott, Sullivan, and Molman. I do want to apologize to the court that we mistakenly said in our brief that CDL, a second district case, was a willful and wanton case. It was not a willful and wanton case but it did involve an analysis under 3102A of constructive notice and whether it could be met in an inspection case. You mentioned 3102A. 3102A and B. And you're relying upon that because it uses the terminology of actual and constructive notice? We're relying on, you mean on the case, the CDL case? No, the statute itself. Oh, the statute itself, the statute itself says that you can't, you have to have constructive notice or actual notice. And then the 106 says, 3106 says you have to be willful and wanton. So obviously, to be willful and wanton, you have to have notice, but 103 entertains constructive notice as notice. But doesn't 102A speak to ordinary negligence, ordinary care? Isn't that just negligence? Regardless, it says you can't go anywhere unless you have constructive notice. There's nothing in any of the legislative hearings or any of the Tort Immunity Act that says you have to have actual knowledge for a willful and wanton claim. And we know that Sullivan says in that case, that's the second district one that says the plaintiff had either actual or constructive knowledge sufficient to survive summary judgment on a willful and wanton claim. In McDermott, they said it was either actual or constructive knowledge. That's in the opinion. So they're saying either one will get you there if you then can go on and do a risk versus burden analysis and show that the conduct was more than mere negligence. So I think the case law is pretty clear that you can have either. And in fact, in the other one, Molman, they don't even differentiate. They just say there was knowledge. They don't ever say it was actual knowledge or constructive knowledge. So I think the knowledge issue is a predicate. And then you look at... So where are the, as you call them, telltale signs of a dangerous condition? Well, first of all, we know the condition existed the day of the accident. We know the condition existed at the time of the last two inspections at least. And we know that because the metallurgist was able to opine that by looking at the broken parts, the rusted bolt holes, and give that opinion. But there's never been a prior incident involving this? That's true. But there had never been a prior incident in McDermott. There had never been a prior incident in Sullivan. There had never been a prior incident in Molman. In Molman, specifically, they went out to inspect, or they were looking, they knew that some pipe covers were missing from some pipes, and they didn't do a good job. They did a partial job. In this case, they knew that a potentially dangerous condition, a pinch point, which is often called a shear point, which can probably even take off a finger on a child, they knew that condition potentially could exist if their equipment wasn't well maintained. But in Molman, they knew or were on notice of the potential. But they did not know that that particular pipe that the plaintiff was injured on had that dangerous condition. They only knew as a general principle that some of their pipes were missing covers. But in our case, we have a pre-assembled item. And with that pre-assembled item, a diagram that doesn't tell about that piece. And then in addition to that, we have them with their inspectional system for years. And so I guess my question there is, it's almost as though I would have sued the manufacturer and the installer rather than the park district. I think you have more liability when they say it's pre-assembled and they guarantee it's going to work forever. Well, if you look at the photographs of the equipment, if you look at 12 A and B in our appendix to our brief, this is not a situation that couldn't be examined just by looking at it. In other words, if I look at this table and one of these legs has got a bad gash and came in, I can see that. Yes, it came pre-assembled. Yeah, but now this is where the Wolf will want the negligence. Now, I buy a bike, but I don't buy a bike with certain items on it so there's holes for additions or there's screws attached, but they're not to be used. What's the difference between that and this if I don't know that this is supposed to be there? Well, if you're a park district running on a bike and you buy the bike and it's properly put together and a part falls off, let's say the parts that would hold the wheel in place fall off, and you're supposed to inspect that bike before you send it out to rent, you're supposed to use ordinary care to do that, and you let that bike go out after inspecting it and looking and it's very clear because these parts are not internal that the bolts that hold the spokes to the wheel on aren't there and you let it go out, you have showed an utter indifference or reckless disregard because you knew or should have known because the condition was there long enough, in this case for months, it was obvious, it's clear it was obvious from the photographs and along the testimony of the three people who looked at it shortly after, we know the condition was there at the time of the accident and for many months more because of the metallurgists. So if you knew all that and you transpose that to the bike analogy and you let that bike go out, you have not used ordinary care in inspecting that bike and because you did not use ordinary care, under Burlingame, to see if it's Wolflin-Wanton, you would do a risk versus burden analysis. It's not Wolflin-Wanton if the burden is on you very great as a municipality to check, in that case it would be no real burden to check to see if the spokes are tight, the bolts are tight that hold the spoke on, versus the potential for danger. Here, the potential for danger is very great on the amputation of a limb, in this case two bones broken, and the burden is very slight. You know, something there raised a question in my mind too. This is a two-inch span. Oh, no, it's much greater than that. Well, in one of the briefs it's a two-inch span. I mean, I think if you look at the photos in 12A and B of the appendix, it's certainly wide enough for a child's limb, a part of the limb to get in. And the thing is, if even only a part gets in, then as it closes down, yes, the child in this case pulled the foot out, but as she's pulling it out the pressure is going down on her bones. The skin, of course, is malleable so she slides it out. So it's an obvious danger. It's a great risk whether it's only two inches or whether it's more. I mean, you can get a finger in in less than two inches and get it snapped off. I mean, the risk is horrendous. And one of the cases that we cited below that we did not put in our brief, I think Scarano versus Village of Eli, where there was a seesaw, I mean a slide that was defective. Now there they had actual notice. But the point is the court said the burden, the risk is so great of children being hurt by playground equipment. It is such a great risk that the municipality needs to carefully inspect equipment. Was there a prior incident, I believe in 2005, where they replaced a similar part of this assembly on another seesaw? There was a couple of material facts in terms of summary judgment that are relevant on that. They knew what these parts were that were missing, and they knew they belonged on that seesaw. They knew because, one, they had rebuilt a similar piece of equipment that only had one coil. This had two. But it still required that the coil be fastened to a plate by brackets so that as the plate went up, the coil would not stay down and create the gap. Instead, it would have to rise a little bit as the plate rised, and no gap could be created. They knew because they had rebuilt a spring coil piece of equipment. They also had ordered a spring clamp before, and they had written right on the face of the manual for the very seesaw that's at issue here because they only had one of these seesaws. They wrote on it, ordered a clamp to keep the coil in place or something like that. So they knew everything they would possibly need to know to discover this. There isn't anything they didn't need to know to discover this. They had gotten information from the playground industry. They had been to safety seminars. They knew they had equipment that had this condition on it. They were out there checking for this thing, and if they were checking for it, it would have been impossible, absolutely impossible not to see this condition. And what Mr. Conway said in his deposition was that he was never at a vantage point where he could see it. Well, that would be like me inspecting this table and then not stepping back to look at it. I mean, it wouldn't be very hard to see this dangerous condition. It wouldn't be very hard at all to see that the clamps were missing. And that's where you get into the reckless. That's where you get into the utter indifference. In McDermott, they knew they had a dangerous condition, a ditch that people could fall in. They knew they had to keep the grass mowed. They didn't keep the grass mowed. They didn't go out to look to see. Not going out to see, even though they didn't even have an inspection system in place, was Wilson-Wanton. Here, inspecting shoddily, repeatedly, just like in Mallman, where they were inspecting shoddily, was Wilson-Wanton. It's the same here. This is very different from, if I can, I'll just very quickly compare some negligence cases. Let me ask you this. Section 102 has an analysis in it where you weigh the practicality of inspection against the likelihood. And that basically relates to ordinary negligence. And that basically says where you're going with your case. It seems to me that you're saying that this should have been discovered and the legislature saw fit to say that it's the duty of the agency to maintain its property. However, it made an exception for recreational property. It says in recreational property you've got to have more than just this analysis that we had in 102. We have to have Wilfo and Wanton. Now, I don't think Wilfo is, I think Wilfo and Wanton must not be synonymous with that. Otherwise, the legislature's passing 106 would have been redundant. What, in this case, took it to the level of Wilfo and Wanton out of just negligence as cited in 102 with this risk analysis? Well, 102 doesn't say that constructive notice can never get you Wilfo and Wanton. 102 says at a minimum you've got to have constructive notice, but since you have to have Wilfo and Wanton for recreational property, you've got to at least meet constructive notice. But we know- But what was the conduct here? The conduct here? Okay. That was Wilfo and Wanton. You're saying it's- I'm sorry. No, go ahead. This man didn't just inspect once. He inspected all the time. But wouldn't that go to 102, the things that's cited in 102? There's an inspection system and it's not- Wouldn't that go to Maumon? Then wouldn't Maumon be mere negligence? Well, Maumon, what happened is that there was a dangerous situation. They knew it was dangerous. As a matter of fact, they said, we're going to protect our equipment from this danger, and they left the pedestrians for their own peril. But they didn't know that every pipe was missing its cap, and so they went out and did a cursory exam. Here they didn't know. They knew about a potentially dangerous situation. How did they know that this seesaw was dangerous? They knew they had a piece of coil spring equipment that could, if the brackets fell off, be very, very dangerous. But did they know that? Yes, of course they knew that because they're going to the training. They're getting the literature. It was on their checklist to check for it. They admitted they checked for it. They knew what pinch points were. They knew that pinch points were a dangerous condition. They knew it could occur on coil spring equipment. They knew they had coil spring equipment. They knew they were out there checking for it all the time. If they had used a reasonable inspection system properly, they would have discovered it. But instead, they sent somebody out who did not carefully inspect. And he didn't just do it once. That's the thing. It's not just once, like in Rooney, where mats fell down, and once they forgot to put them up. Or it isn't an intervention of a third party, like in Belek or one of those cases, or ORVAC, where there's a skate ramp somebody left. Over and over and over again, they did not diligently look. So you're saying it's consistently inadequate equates to willful and want. I'm saying that consciously not checking for a condition that you know is dangerous on a piece of playground equipment where small children play on a repeated basis is willful and want. If he had been distracted while he was checking one time, and something had happened, and he turned and he'd taken care of the distraction and come back and forgotten where he was on the inspection list, that would be one thing. But to repeatedly do this when this condition existed for months. What evidence do we have that he consciously disregarded this? Because the condition existed there for months, all right, according to the metallurgist who was able to determine it. Is that negligently just lazy or negligent or not competent? Now, what we're talking about is how long had the condition existed and how easy was it for the municipality to detect. That would be that Kalmara case, the water meter missing the lid. It was not willful and want in there because the condition had only existed two to four weeks, and it was not long enough for constructive notice to kick in for a willful and want claim. And that's a very good example to contrast because here, this condition existed for months. The inspection was one that if you again look at those pictures and you are a maintenance man, you would have to see that condition if you were looking for it. And to disregard it or to not do it is willful and want. You can miss it once maybe, but to miss it on every inspection when it existed for months, it's really inexcusable. It really does shock the conscience that when a child's limb could be amputated or bones broken, that this continued disregard in the inspection, it really is willful and want. Now, I don't know if you wanted any on the intended user issue. I wasn't going to go into that unless you have questions. I don't think unless you really want to, it's not technically, it shouldn't even be here. Yes. We can evaluate on anything, but I don't think it's important to any of us, is it? The intended user? No. Fine. Okay. Thank you, Your Honor. All right. Good morning. Please, the Court. My name is Ed Dutton. I have the Park District. I know the Court doesn't want to talk about the non-intended use issue. I'm going to touch on it for a second because Justice Smith raised an issue that it shouldn't properly be here. No, I'm saying we could either way, but we could address it. It appears we are more interested in the other issue. Absolutely agree. And I want to talk about what you're interested in and also because, as I've argued from day one, if the plaintiff can't state a cause of action or develop facts to establish willful and wanton conduct, we don't need to reach the non-intended use issue. I can win on any ground. With regard to the willful and wanton conduct issue, I actually was going to use the plaintiff's own allegations and the plaintiff's argument in their brief because it goes directly, Justice, to where you were pointing out, which is what the plaintiff is really attempting to do here is to collapse negligence with willful and wanton. In paragraphs 10 and 11 of the Third Amendment complaint, the plaintiff essentially says the Park District had a reasonable inspection system. That system was designed and intended to protect patrons and to find defects in the property. That's a good thing. That's actually evidence of a conscious regard. On top of it, the plaintiff says the Park District failed to exercise ordinary care by not discovering this condition, which no one knows how long it existed. I actually think the crux of the plaintiff's argument, I'm looking at the plaintiff's reply brief, I focused on this, page 6, and I'm quoting, had defendant's conduct been reasonable but inadequate, whether from inadvertence or carelessness, rather than unreasonable, its conduct would not be willful and wanton. How I interpret that sentence is the plaintiff is essentially saying if you have an inspection system and you find the problem, you're in the clear. But if you have an inspection system and you don't find the problem, even if you follow it reasonably, which is what they're arguing here, that should be evidence of willful and wanton. In my view of the world, that isn't even evidence of negligence. The standard is not perfect care in maintaining our property, and that's true for anyone, Park Districts, private property owners. It is reasonable care. That's the issue. The plaintiff says we did it unreasonably. Let's accept that as being true. I don't agree with it, but accept it for argument's sake. Being unreasonable is never going to the rise to the level of willful and wanton. At most, it gets you into negligence. Justice House, again, that was the point you raised when you focused on 3102. Yes, the opening section for a public entity to have a cause of action pleaded against it or proven against it is 3102. We start there. Has the plaintiff shown actual or constructive notice of the existence of a defective condition in sufficient time prior to the injury to have remedy to a warrant of it? That's almost the exact wording of 3102. No dispute there. But 3102 is the prerequisite to even state a negligence cause of action. 3106 is designed and intended, and it's good public policy, designed and intended to encourage the development of recreational property by raising the level to a willful and wanton standard. You have immunity from negligence liability. You will be liable for willful and wanton. I've said to the court, I'm not aware of another case, and the plaintiff has not cited one, where any court has found that having an inspection system that I think the plaintiff just said that we repeatedly follow, I'm thinking that's a fantastic thing. That's not evidence of willful and wanton. That's evidence of a conscious regard. We were continually inspecting. What about their, I guess it's a Laze O-E-L-Z-E case? Yes, I'm aware of the case. It's a non-Tort Immunity Act case. It's a common law definition. Essentially, as I recall in that case, there was evidence that there was a hole in a fence, if I recall, essentially, and the court said that that was enough under the common law standard to raise a question of fact on willful and wanton. That's completely different than the Tort Immunity Act standard, which requires a course of action showing an actual or deliberate intention to cause harm or a conscious disregard or utter indifference. There's a key point there, by the way. The word recklessness nowhere appears in the Tort Immunity Act definition. That's critical. The plaintiff spends quite a bit of time in their brief talking about the development of the Tort Immunity Act from 1965, amended in 1986, and then amended again in 1998. And then the plaintiff talks about the Murray case, where the Supreme Court talked about the pre-1998 amendment or the pre-1998 statement of 1-2-10. What happened in 1998 was only this. The legislature, and actually the plaintiff has some of the legislative discussion and appendix to their brief, but the legislature in 1998 did really two things, and they were in tandem. They amended 3-1-0-8, which used to be an absolute immunity for supervision, and they installed a willful and wanton exception. The reason why they did that was in response to the Supreme Court's case in Barnett v. Ion Park District. And the court said, hey, we're not going to, or not the court, the legislature said, we're not going to have absolute immunity anymore for inadequate supervision. It's a willful and wanton standard. But at the same time, in response to ZIARCO, which was what I call the slippery slope, a little more than negligence, a little less than intentional, it just depends. That's the common law standard. The legislature said, we're going to get away from that. We want the courts to focus on the statutory definition in 1-2-10. The reason why I go into that a little offshoot, it's important. If the plaintiff's citing non-tort immunity act cases, they don't come into play here because they're not dealing with the Tort Immunity Act definition, which is as defined in 1-2-10. With regard to the case law, most of what I've cited in my brief comes from this appellate court. I've cited more than 10 cases. There must be 20 out there, but I've focused on ones that deal with conditions of recreational property. And in each one of those cases, if plaintiff's argument were correct, each one of those would have to be reversed. We couldn't have the Pomero case stand for what it stands for, where the public entity knows of the defect and directs a grade school child, just like this child, to run full speed toward that known defect. And the court says, even that set of facts is not enough to rise to the heightened level to establish willful and wanton conduct. That's also true in the Rooney case, where you have the mats repeatedly fall. The public entity creates the condition by putting the mats up, knows they repeatedly fall onto a field of play, and yet allows the mats to stay there and the plaintiff trips over them. And the court says, even that set of facts, and that was on the pleadings, is not enough to establish willful and wanton. Backing into this case, when we look at what the facts are, we have, and these are undisputed, in fact, the plaintiff pleads, we have an inspection system that we regularly follow. It's done on a monthly basis. Now, they're saying, though, that you had more knowledge than at least I found in the brief. Sure. As to the actual preassembled thing and how it's there and that it's visible. Sure. Let's talk about that for a second. The testimony was that the Park District had another piece of spring equipment. This piece of equipment, let's pull out the photograph here. This is in the record. It's also in the briefs. This has two springs in the center of it. These brackets are up underneath right here. And this becomes important because the plaintiff is saying, well, they should have seen, if they did the inspection adequately, they would have seen. Dennis Conway, the Park District employee, read his testimony. Dennis Conway, who did the inspections on a monthly basis, would sit on one of these and make it go up and down. Well, if you're seated here, you can't see in here. He didn't know that this was separating. And I got, by the way, that slightly over two inches. That's actually from the plaintiff's expert's own testimony, Mr. Hooter. He said that he measured the separation at its highest point where the spring separated from the top plate and it was slightly over two inches. I've got that cited in my brief if the court wants me to reference that. But that's where that comes from. That's absolutely what his testimony was. The other piece of spring equipment that the Park District had that they had repaired previously was what's called a single spring. And it's not a seesaw. That was a piece of animal equipment we all saw when we were kids in the park. They've got an animal. It's up on top of a single spring that bends back and forth. There they absolutely knew that there were clips at the top of the spring because the spring had to be connected to the bottom of the animal. Here, what they've got is actually the fulcrum. There's bar going across. That's why the Park District didn't know that there were any brackets up in there because this all comes as a preassembled unit and sits on top of the fulcrum. What's also critical here, the testimony from the plaintiff, from Deborah Farrell, who's the school principal who's been there and sees this playground on a regular basis, and the Park District's own employees say this never performed differently than at any point in time. The child who was on here, Taylor Taglier, says that every time she'd been on it, it worked the same as the day she'd been on it when this accident occurred. So you have no indication from the equipment that there's something flapping or falling off or broken. The equipment is operating properly, and that's critical because the Park District is inspecting. There's no reason to believe that there's anything wrong with it. No one's complained. No one said there's a problem. There's been no prior injury. Well, they're claiming that there was an inspection, that there was an utter indifference to or disregard to this situation that could impact upon the safety of these children. Aren't they saying that? They are arguing that, and I find that an interesting argument for this reason. Doesn't that transform itself basically into a question of fact? I don't believe it ever would. Even setting aside the particular facts, the fact that the Park District has an inspection system and actually inspects, the definition of willful and wanton conduct is a conscious disregard. How can you, on the one hand, inspect? Utter indifference or a conscious disregard for the safety of others. Absolutely. How can you have an inspection system and actually go out, do a hands-on inspection, document that inspection on a regular basis? How could that ever equate with willful and wanton conduct? You have an expert, the plaintiff has an expert, who's saying that it was readily apparent to him when he came out there. Conway's saying it wasn't readily apparent. It seems to me that that refines itself to a question of fact. I disagree for several reasons. One, before this occurrence, let's take the definition out of Winfrey, and I'll get back to the other reasons, too. Definition out of Winfrey, how do you get to willful and wanton conduct? And this is nothing new. You either have actual notice or knowledge that there's a problem, or you have notice or knowledge of prior injuries, which indicates a problem, or from the Benhart case, you intentionally remove a safety feature and device. It's not. And also, if you looked but didn't see, because that's mere inadvertence. So, no, I don't think that ever reaches there. Aren't acts of omission sufficient? I don't personally believe so, because an act of omission would never rise to the level of a course of action. Well, Justice Kilbride, in the most recent case, equated acts of omission with willful and wanton. He went through an analysis and equated it to the criminal code. And he talked in terms of, in the criminal code, of course, we have standards of intentional knowledge, we have recklessness, and we have negligence. And he related to acts of omission in the Murray case and said that that would be sufficient to establish willful and wanton. Sure. I agree with you that that is Justice Kilbride's analysis in the Murray case. Absolutely true. Justice Kilbride also went to great lengths to explain that the analysis they were doing dealt only with, that was a 1992 occurrence in Murray, dealt only with what happened, what the law was in 1992 when he was saying, we have ZRCO out there, we're not going to deal with what the legislature intended to do in 1998 when they amended Section 1-210 to say, hey, by the way, the definition that's going to apply, the only definition in a Tort Immunity Act case, is the Tort Immunity Act definition, which doesn't use the word recklessness, which is where I started out. That's precisely why all of that discussion is well and good. It doesn't control in this case, number one. And number two, I get back to, in my view and in my reading of 1-210, if you are doing an inspection system, which is to be encouraged, that's the whole point of adopting the Tort Immunity Act, encourage public entities, give them immunity from liability, but encourage them. That's both in 3-102B, if you have an inspection system and you show that it could have found it, then you can't feed constructive notice. We didn't raise that here. We didn't need to. And then under 3-106, which says, even if you had all of that, you might have negligence, it's never going to get to Willful and Wanton. But what about their argument? Again, you say it's not a tort case. But they say consistently inadequate, not once, twice, three, five, ten. Where do you draw the line there? I mean, can you just be, that's not inadvertence. That's a step more. That's saying my system that I designed may have been inadequate from day one. And then you're going to say, but we weren't on notice. But should you not have, in the course, discovered this if you've seen 10, 20, 30 inspections? Let's go with that. First of all, we all know that the only testimony in this case with regard to how long this part was missing is the speculation by plaintiff's experts that based upon the rust he saw, he thinks it was missing at least 60 days. And that's pleaded in the complaint as well. So they do these inspections once a month. So we're not looking at six or eight or ten. But setting aside that speculative testimony by the plaintiff's expert, let's just take that as being true. Let's set 60 days as the due date. If an entity is inspecting and they fail to see, I don't believe that could ever be Willful and Wanton conduct because by the mere fact of inspecting, they're showing a conscious regard for the safety of patrons. From that argument, it would be better off had the park district never inspected. Nothing requires them to inspect. And, in fact, Stephen King, who designed this piece of equipment, he's essentially the owner. He's the chairman of the Board of Landscape Structures. He said, these things can be inspected, we recommend, on either a monthly, a semi-monthly, or an annual basis depending on the use, and that's up to the individual entity. Under the manufacturer's own view of how often this should be inspected, and remember this was touched on previously actually by Justice Smith, when this was installed at the park district, LSI Landscape Structures said, we intend these bolts to stay there forever. That's why they actually don't send us the diagram for the internal part of Assembly A. They put it on with lock nuts and he testified, we expect those are going to be there. We've actually never had this issue come up before according to Mr. King. So, with that testimony, we have the park district regularly inspecting, no issues or problems. Could we ever come up with a case where a park district could intentionally, essentially, not look and not see they do the inspections, but they drive by from two miles away and say, oh, yeah, I did it, or I flew a helicopter over? Sure. At some point, I would say that the argument gets so far out there that I'd have to say, conceivably, you could have that. No reported cases ever go on there. I'm not aware of a set of facts that's ever been litigated with that type of a very, very far-out scenario. But if we're staying within the realm of, in effect, what the plaintiff's allegations are, paragraphs 10 and 11 of their Third Amendment complaint, the park district had an adequate inspection system. The plaintiffs repeatedly argued throughout their brief, it was adequate, it was reasonable, they just should have done a better job. The should have done a better job may be enough to raise a question of fact on negligence. It will never be enough to raise a question of fact on Willful and Wanton. And one more thing to throw on top of that, if that argument were true, this court would have to disregard or overturn however you look at it. Winfrey, for example, where they have a gaping hole in the fence and the allegation is the park district had actual notice of it. Or Pomera, where they have the pile of loose and broken asphalt, and there's no dispute that the park district had, or there was a school district, had actual notice of it. And if those cases aren't enough for Willful and Wanton, where you have actual notice of the problem, how could you ever have it logically where the plaintiff says you failed to see. That's where we're back to inadvertence, and inadvertence is never going to be a course of action that could equate with Willful and Wanton. If there's any further questions, I pretty much beat the Willful and Wanton issue to death. Thank you. I appreciate it. Thank you again for your time. I think that if we look at the legislative history, and that goes to the question I received before Justice House on 3-102, the legislature in passing in 1986 was specifically asked when amending the Tort Immunity Act whether constructive knowledge or actual knowledge was enough for Willful and Wanton, and they said yes. Yes, it would be. Preston asked the question, and Guymon said yes. So if the legislator has said constructive or actual is enough for Willful and Wanton under the definition in the Tort Immunity Act, and nothing has changed in terms of what's been done to that language since the 1986 amendment, then the legislative intent is clear. Now, we can see that when we look at Sullivan, for example, where the opinion says, really, we don't care if it's actual or if it's constructive. You've got either. You're allowed to go on Willful and Wanton. They talked about what they knew at a board meeting and what they didn't do, but in essence they said you either have actual or constructive here, so it's good enough to go. Now, Olitz, I think, judged Knesset's opinion.  And that was an inspection case where they failed, and only once did they fail. Here we're saying they repeatedly failed. Now, I'm not trying to collapse negligence into Willful and Wanton here. I am trying to show there's a difference between a third-party intervening that the park district or municipality doesn't know about, or a condition that hasn't been there long enough or is not open and obvious enough, like Pomeroy, the water meter case, or it's so obvious to the user, i.e., in Winfrey, the person who's inspecting the fence, that he should have seen it for himself. We're talking about something a child would never know about, and we are talking about a repeated failure. And I think it's interesting that the defendant is saying, well, yes, if we did the inspections and we saw it, we should have fixed it. But if you look at the photographs in the brief, there's absolutely no reason you can't see the rust and the missing bolt holes. If you compare that picture to what this thing looks like repaired, it's so obvious. You can see the bolts are in the bolt holes. The clamp is right there. It's very, very obvious. And we're looking at it in a black-and-white photo here. We're not even looking at it. Right there, that's a close-up. There is the missing part, and there are the missing parts in there. You can see it. And it is the repeated over-and-over conduct, considering that children are at risk here, that makes it the wolf one want. Thank you.  We'll take it under advisement and get back to you.